UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ST. CLAIRE MARINE SALVAGE, INC.,          Case No. 13-10316

               Plaintiff,          Michael Hluchaniuk

v.          U.S. Magistrate Judge

MICHAEL BULGARELLI, *et al*,

               Defendants.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
PURSUANT TO RULE 52(a)**

**I.      BACKGROUND**

This matter is before the Court based on the consent of the parties and after

a non-jury trial was conducted by the Court.  (Dkt. 27).  This case involves a

dispute relating to the amount defendant Michael Bulgarelli is obligated to pay for

services that were provided by plaintiff to Mr. Bulgarelli on August 18, 2012, with

respect to his boat running aground in Lake St. Clair.  Plaintiff contends that Mr.

Bulgarelli signed an agreement obligating him to pay a specified fee for plaintiff's

efforts in freeing his boat.  Mr. Bulgarelli, while acknowledging that his boat was

freed as a result of plaintiff's efforts, contends that he was informed that the cost

for the services would be within a certain range and subsequently he was sent a

bill for those services that greatly exceeded the amount he was initially told.

1

Plaintiff's complaint alleges three causes of action.  These claims include: (1) enforcement of preferred maritime lien, (2) breach of maritime salvage contract, and (3) quantum meruit/unjust enrichment.  (Dkt. 1).  Defendants[1] filed a counterclaim also alleging three claims.  These claims include: (1) fraud, (2) innocent misrepresentation, and (3) reformation.  (Dkt. 10).

## II.   APPLICABLE LAW

The parties have agreed that this case is properly in federal court based on the admiralty jurisdiction of federal courts.  28 U.S.C. § 1333.  A determination that the court's admiralty jurisdiction is properly invoked does not necessarily answer the question as to what law applies to the contractual dispute in the case. Federal law, rather than state law, governs the dispute if two factors are established.  The first factor is whether "'the nature and character of the contract' ... has 'reference to maritime service or maritime transactions.'" *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 24 (2004), quoting *North Pacific S.S. Co. v. Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 125 (1919). The second factor is whether the case is "inherently local" such that local interests should be accommodated without defeating a federal interest with the "touchstone [being] a concern for the uniform meaning of maritime contracts." *Id.* at 28.

---

[1] There are two defendants in this case, Mr. Bulgarelli and the 2004 36 foot Sea Ray, MC No. 2220 TM.  For ease of reference, the Court will simply refer to "defendant" or "Mr. Bulgarelli."

Applying these two factors, a contract to free a boat from being grounded in or near an international navigation route, such as Lake St. Clair, is clearly a contract relating to maritime service or transactions.  Also, no significant state or local interest is implicated by these events that justifies defeating the federal interest of establishing uniformity in the way similar contracts are interpreted. Under these circumstances, federal law applies to the relevant issues in this case. In analyzing a breach of contract claim in this context "we look both to the federal maritime law of contracts as well as to general principles of contract interpretation." *Royal Ins. Co. Of America v. Orient Overseas Container Line LTD.*, 525 F.3d 409, 421 (6th Cir. 2008).

## III.    EVIDENCE

During the non-jury trial held on May 20, 2014, plaintiff called three witnesses to testify and defendant called two witnesses.  The first witness for plaintiff was Chantel Saincome, who was employed as an insurance adjuster for the Frankenmuth Mutual Insurance Company, the company that insured Mr. Bulgarelli's boat at the time of the incident in question.  Ms. Saincome testified that Mr. Bulgarelli made a claim for the cost of towing the boat and that at some point she had called plaintiff to provide them a fax number so that a copy of the invoice for the towing work could be faxed to the insurance company.  She recalled Mr. Bulgarelli speaking with her about the claim but could not recall if he

3

complained about the amount of the bill.  Ms. Saincome stated a check in the

amount of $1,000.00 was issued on the claim, which was the policy limit for this

type of claim.

The second witness for plaintiff was Captain William Leslie.  At the time of

the incident, Captain Leslie was an experienced salvage boat captain and was

employed as the operations manager of plaintiff, St. Clair Marine, which operates

primarily on Lake St. Clair.  He stated that St. Clair Marine was a franchisee for

"Tow Boat US,"[2] which is a boat towing insurance provider.  Merely being a

member of "Tow Boat US" did not include coverage for towing and the standard

coverage for a Tow Boat US policy, if purchased, included towing and freeing a

boat from a "soft" grounding but not a "hard" grounding.  He defined "soft"

grounding as a situation where a grounded boat could be freed by a tow boat and

he defined "hard" grounding as a situation where the weight of the boat was on the

bottom and the boat was in peril.

Regarding the situation with Mr. Bulgarelli, Captain Leslie stated that a call

came in and was received by Sherry Rushing, another employee at St. Clair

Marine.  He was dispatched by Ms. Rushing and informed that the boat was a 36

foot Sea Ray located near Walpole Island.  Captain Leslie stated when he arrived

---

[2] It is not clear if the correct name for this entity is Tow Boat US or Boat US but it was referred to as Tow Boat US throughout the trial and the correct name is not important to the disposition of the case.

at the location of Mr. Bulgarelli's boat, he could tell it was a "hard" grounding based on where the waterline was on the hull of the boat.  Captain Leslie described the weather conditions as a strong, 20-25 knot, northeast wind with extremely rough water conditions.  He stated the boat was located on the South Channel, which has a "high" current.  The Captain stated that he tied his boat up to Mr. Bulgarelli's boat and proceeded to discuss the situation with Mr. Bulgarelli. Captain Leslie told Mr. Bulgarelli that the boat was "hard" aground, that freeing the boat would not be covered by Tow Boat US, and that the cost of Captain Leslie freeing the boat would be $250.00 per foot.  Captain Leslie stated that Mr. Bulgarelli agreed to have Captain Leslie do the work and signed a salvage agreement, that was provided by Captain Leslie, after Captain Leslie wrote $250.00 per foot on the agreement.

After the agreement was signed, Captain Leslie returned to his boat and then maneuvered his boat to the bow of Mr. Bulgarelli's boat where he "tucked" his boat under the bow of the Bulgarelli boat and, using the props on his boat, "dug out" the Bulgarelli boat, pulling it into the main channel once it was freed. Captain Leslie thought the risk level of the operation was high due to the wind and that if he would have pulled the boat straight out, the hull of the boat would be damaged.

When he returned to the marina, Captain Leslie prepared a salvage data

5

sheet, which was subsequently incorporated into an invoice and then sent to Mr. Bulgarelli's insurance company. Captain Leslie stated Mr. Bulgarelli did not contact him and accuse him of altering the salvage agreement.

On cross examination Captain Leslie stated that he thought Mr. Bulgarelli was a "towing member" of Tow Boat US at the time of the incident but recently learned that he was not. Captain Leslie also stated he was "shocked" that Mr. Bulgarelli's insurance company did not pay the salvage charge.

With respect to the incident in question, Captain Leslie stated that the form salvage agreement was one St. Clair Marine used at the time, which did not include carbon copies and it was not his practice to provide a signed copy to the customer at the time of the incident. Following the freeing of Mr. Bulgarelli's boat, Captain Leslie prepared a written statement of what happened on a word processor, which was sent to Ms. Rushing who incorporated his statement, word for word, into an invoice that was prepared. The invoice was made a trial exhibit.

On cross examination, Captain Leslie repeated his testimony that he determined it was a "hard" grounding only after he arrived at the location of Mr. Bulgarelli's boat. When shown the specific language of the invoice, which stated "Received a call from BoatUS dispatch that a member was stranded hard aground in the south channel on the Seaway Island side," Captain Leslie stated he had assumed that the boat was "hard" aground before he went out due to the bottom

6

conditions in the area.  Captain Leslie stated the process of "digging" the
Bulgarelli boat out through the use of the prop wash from the salvage boat took
about 29 minutes and then it took about a minute to tow the boat to deep water.

A series of questions on cross examination related to other litigation
involving the same plaintiff and other boaters under circumstances similar to those
in the present case - a dispute over the salvage charge.  In most, if not all of the
other cases, the salvage agreement, purportedly signed by the customer, did not
contain a written statement of the charge that St. Clair Marine claimed for the
services provided.  Many of these other cases occurred around the time of the
present controversy.

On redirect, Captain Leslie testified he would not have informed Mr.
Bulgarelli that the charge for the service was only $1,000.00 because he thought
Mr. Bulgarelli had towing coverage from Tow Boat US, which would have paid
St. Clair Marine more than $1,000.00.  However, Captain Leslie stated he knew
Tow Boat US would not cover services related to a "hard" grounding, even if Mr.
Bulgarelli had towing coverage.

The third and final witness for plaintiff was Sherry Rushing.  She stated that
she was employed at St. Clair Marine and, among other duties, she prepares
invoices for the services performed by St. Clair Marine.  She recalled that she had
sent, by email, a copy of the invoice to Mr. Bulgarelli and asked him for insurance

information.  Mr. Bulgarelli called later and said he was having trouble with his insurance company and asked for assistance from St. Clair Marine in getting the claim paid.  In her conversations with Mr. Bulgarelli, he did not mention any problem with the invoice and did not claim that the salvage agreement had been altered.  Ms. Rushing called the insurance company regarding the claim and she was informed that the question would be addressed by a supervisor.

The first of the two defendant's witnesses was Kimberlie Jones.  Ms. Jones testified that she was a friend of Mr. Bulgarelli and that they had gone for a boat ride on the day in question.  She indicated there apparently was a problem with the depth finder on the boat and at some point the boat came to a stop without an injury or damage to the boat.  She described the day as being sunny and in the 80s. She called it a "perfect" day that was not windy and the water was not rough.  The experience of being on a boat that ran aground was one that she had not had before.

At first, Ms. Jones and Mr. Bulgarelli called Ms. Jones' father, who had prior boating experience but he could not offer any assistance.  Mr. Bulgarelli then called to get a tow but no one came out for an hour to an hour and a half.  When Captain Leslie arrived at the site, he provided a salvage agreement, which Mr. Bulgarelli signed.  Ms. Jones asked Captain Leslie how much the towing fee would be and he told her and Mr. Bulgarelli that it would be $1,000.00 to

$1,200.00.  She stated Captain Leslie never said it would be $250.00 per foot.

While she acknowledged that she did not read the salvage agreement carefully, she

stated that there was nothing on the contract regarding a charge of $250.00 per

foot.  She further testified that, after the meeting with Captain Leslie and the

signing of the salvage agreement, Captain Leslie tied a line from the Bulgarelli

boat to the salvage boat and pulled the Bulgarelli boat off "within minutes."

     The second witness for defendant, and the final witness during the trial, was

Michael Bulgarelli.  Mr. Bulgarelli stated he was a relatively inexperienced boater

and had acquired the 36 foot Sea Ray a few months prior to the incident on August

18, 2012.  He testified he and Ms. Jones left in the later part of the afternoon to go

on a boat ride with the weather being "really nice."  The depth finder had been

giving him some problems and, while the boat was going very slowly, it became

"stuck."  The motor shut off when the boat stopped.  He restarted the motor and

attempted to back out of the position the boat was in but that did not work.  He

called a few people including the person who had sold him the boat, but no one

was available to assist him.  At one point he got out of the boat and attempted to

push the boat to deeper water but that effort was not successful either.  He testified

the bottom where the boat was grounded was sand with no rocks.  When those

efforts proved futile he called Tow Boat US, believing he had signed up for their

"package."  The person answering the phone at Tow Boat US asked some

questions regarding the circumstances and Mr. Bulgarelli indicated there were no injuries and no damage to the boat.  He then gave a general description of the location of the boat, not having great familiarity with the area.  He was told a boat would be dispatched to assist him.  After 45 minutes or an hour, when no one had arrived, he called back and was informed the boat that was coming to help him was in the area attending to some other matters and would be there soon.

Approximately an hour and a half after the first call to Tow Boat US, Captain Leslie arrived.  By that time, it was approaching dusk and the water was calm.  Captain Leslie pulled his boat to the port, or left, side of the Bulgarelli boat and tied the boats together.  He came aboard the Bulgarelli boat and discussed the circumstances with Mr. Bulgarelli.  He informed Mr. Bulgarelli that his Tow Boat US coverage would not cover the costs of his service and presented a form agreement to Mr. Bulgarelli for his signature.  Mr. Bulgarelli asked how much the charge would be and Captain Leslie stated $1,000.00 to $1,200.00.  Mr. Bulgarelli thought that was high, but Captain Leslie stated Mr. Bulgarelli's insurance company would pay for it.  Mr. Bulgarelli then signed the agreement.  Captain Leslie instructed Mr. Bulgarelli to file a claim with his insurance company and the insurance company would deal directly with St. Clair Marine.  Mr. Bulgarelli testified that Captain Leslie never mentioned a charge of $250.00 per foot and that the written agreement did not contain the handwritten figure of $250.00 per foot

10

when he signed it.  Mr. Bulgarelli said he would not have signed the agreement if the thought the charge would have been $9,000.00.

After the agreement was signed, a line from the Bulgarelli boat was attached to the salvage boat and Captain Leslie attempted to pull the Bulgarelli boat in one direction which was not successful.  Captain Leslie repositioned the salvage boat and the Bulgarelli boat "came right off."  The process took 5-10 minutes.  After the boat was freed, the boats went in separate directions.  According to Mr. Bulgarelli, the salvage boat never churned up the area in front of his boat as Captain Leslie had described.

Following the incident on Lake St. Clair, Mr. Bulgarelli called his insurance company and obtained a claim number, which was communicated to St. Clair Marine.  Mr. Bulgarelli did not see the invoice until a couple of weeks after the incident and did not realize the charge for the service was $9,000.00 until he saw the invoice.  Mr. Bulgarelli told his insurance company he thought the charge was "exorbitant."  Someone from St. Clair Marine called to say the insurance company would not pay and Mr. Bulgarelli informed the person who called that the fee was between St. Clair Marine and the insurance company.

Mr. Bulgarelli stated someone from the insurance company called him and asked what had happened.  After describing the incident, the insurance company determined the service was a "tow" and not a "salvage" and offered to pay

11

$1,000.00 for the claim. Mr. Bulgarelli offered this amount to St. Clair Marine but they would not accept it.

On cross examination, Mr. Bulgarelli admitted that Captain Leslie had done his job and freed his boat but he repeated his testimony that Captain Leslie had told him the job would be $1,000.00-$1,200.00 and that there was no indication of price on the agreement when he signed it. He stated he only signed the agreement on the representation that the fee would be within that range. With respect to the invoice, Mr. Bulgarelli stated the invoice was sent to the insurance company before he received a copy of it.

The exhibits offered and admitted during the trial were Exhibit #1 (Salvage Agreement dated August 18, 2012), Exhibit #2 (Invoice to Michael Bulgarelli from St. Clair), Exhibit #302 (Captain William Leslie business card), and Exhibit #303 (screen shot of St. Clair Marine internet page).[3]

## IV.   FINDINGS OF FACT

The evidence offered during the trial demonstrates two significantly different descriptions of the events of August 18, 2012. These two descriptions, one by Captain Leslie and the other by Michael Bulgarelli and Kimberlie Jones, cannot be reconciled as to the matters that are important to a verdict in this case

---

[3] Both parties submitted other proposed exhibits prior to trial but the identified exhibits were the only ones offered and admitted during the trial.

and therefore it will be necessary to assess the credibility of the witnesses and make findings of fact with that assessment in mind.

Traditional factors in assessing credibility include such things as (1) the demeanor of the witness, (2) the inherent plausibility of the witness's testimony, (3) the consistency of the testimony of the witness with prior statements of the witness, (4) the internal consistency of the witness's statements, (5) the consistency of the testimony with other evidence, (6) the accuracy of the witness's testimony, and (7) the interest of the witness in the outcome of the proceeding. Other factors may also apply but a credibility assessment is commonly made based on the totality of the circumstances after considering any relevant fact that may impact the witnesses credibility. Applying these factors to the witnesses who testified in this case results in the following findings.

Chantel Saincome was an adjuster who handled the claim made by Mr. Bulgarelli to the Frankenmuth Mutual Insurance Company. She appeared to testify in a matter-of-fact manner about what for her was a fairly regular business transaction in which she had a limited role. She had no stake in the outcome of the case and her testimony was not really contradicted by the other evidence in the case.

Captain Williams Leslie had a stake in the outcome of the case in that he, or at least a business that he had an ownership interest in, was attempting to collect a

debt from Mr. Bulgarelli. His demeanor on the witness stand was not one that left the impression that he was being completely truthful. He responded reasonably to some questions but was reluctant to respond to others. As to the plausibility of some of his answers, he was asked about the narrative report that he drafted immediately following the incident, which included a statement that he knew the boat was "hard" aground before he went to the site. His response was that he knew the area where the boat was and that if it had run aground in that area, it must be hard aground. It does not seem plausible that even an experienced boater, as Captain Leslie certainly was, would have been able to conclude the boat was "hard" aground based on a very general idea of where the boat was located. Lake St. Clair is a large body of water and Mr. Bulgarelli was an inexperienced boater who only gave a general description of his location to the person answering the phone on the national Tow Boat US phone line.

Captain Leslie's initial testimony about the Bulgarelli boat being "hard" aground was that when he arrived at the location where the boat was aground he could tell it was "hard" aground based on the way it was sitting in the water. Exhibit 303, a screen shot from the St. Clair Marine website from some point in the past, indicates that the fee for a "hard" grounding is based on a set of criteria (which are not identified on the website) and that there is a 10 point system for determining the amount of the salvage award. No explanation was provided for

14

how a single factor - how the boat was sitting in the water - resulted in the conclusion that it was "hard" aground when there are apparently several factors on which such a conclusion is normally based.

An area of cross-examination related to the circumstances of several other lawsuits filed by St. Clair Marine regarding unpaid towing/salvage fees.  Captain Leslie denied familiarity with the underlying facts of most of those cases even though he was the person verifying the accuracy of some of the complaints.  While it is understandable that someone in his position would not be fully aware of the facts of every salvage case he had been involved with, his almost complete lack of knowledge of the half dozen or so cases that resulted in lawsuits, where he was verifying the accuracy of the facts, lacked credibility.

The narrative report that he wrote following the incident seemed to be designed to persuade the reader that this was a "hard" grounding rather than merely presenting a factual description of what had taken place.  Beginning with the assertion in the opening sentence that this was a "hard" grounding - something that appeared to be known before the salvage boat left the marina - and continuing with the detailed description of the way the salvage boat had to "wash out the bottom" underneath the boat to free it, which was made more difficult due to "rough" water and current.  Captain Leslie testified the "digging out" process took 29 minutes.  An inference certainly can be drawn from the tone of the narrative

15

report in the invoice that the purpose was to convince the insurance company to pay the cost of a "hard" grounding salvage rather than the lower cost of simple tow to pull a boat off a "soft" grounding.

Also, his description of the weather and water conditions at the time of the incident was inconsistent with the description by Mr. Bulgarelli and Ms. Jones and also inconsistent with his explanation of the events. He said the water was "extremely" rough but he said he tied his boat to the Bulgarelli boat and boarded the Bulgarelli boat where he spoke with Mr. Bulgarelli. It seems unlikely that this could be accomplished if the water was "extremely" rough as he described.

Sherry Rushing testified in a straightforward manner about her involvement in this incident. While she has a stake in the outcome of the case as an employee of the plaintiff, her testimony was credible.

Kimberlie Jones has a potential bias given that she is a "friend" of Mr. Bulgarelli, but otherwise she seemed like a credible witness. Her testimony was plausible and her demeanor was straightforward. She seemed to have a good recall of the events of the day in question and her testimony was internally consistent.

Michael Bulgarelli has an obvious bias in the case in light of the possibility that he could be held financially responsible for the claimed damages of plaintiff. However, his demeanor on the witness stand did not suggest deceit or falsehood.

16

He described the events in question with fairly good detail and seemed to have a good recollection of things without seeking to stretch facts to create a self-serving response. His testimony was generally consistent with Ms. Jones, particularly with respect to the description of the effort necessary to free the boat, which is a critical question of fact. Plaintiff challenges Mr. Bulgarelli's credibility by attempting to demonstrate that, after receiving a copy of the invoice, Mr. Bulgarelli did not complain about the amount of the charge as forcefully as he might have. Mr. Bulgarelli testified that while he thought the amount of the charge was very high, he also felt that the payment was up to his insurance company and therefore he did not feel as personally responsible for the charge as he might have otherwise. This is definitely a cynical view of financial responsibility, but it is one that, in the view of the undersigned, is not uncommon. Individuals who do not feel personally burdened by a financial obligation are often insensitive to the weight of that burden on others. For example, this principle plays out frequently in the area of health care. A person who receives health care services is not very concerned about the cost of those services when the person's insurance company is paying for them.

Based on the above credibility assessment, the Court credits the testimony of Mr. Bulgarelli that he was told by Captain Leslie that the cost of the salvage would be no more than $1,200.00 and that he was not told the cost would be

17

$250.00 per foot. The Court further credits the testimony of Mr. Bulgarelli that no

extraordinary efforts were involved in freeing his boat and that the boat was pulled

off the sand with minor effort on the part of Captain Leslie. To the extent Captain

Leslie later billed $9,000.00 for the salvage services, Captain Leslie knew the

representation of $1,200.00 was false at the time he told Mr. Bulgarelli what the

charge would be.

## V.    ANALYSIS AND CONCLUSIONS

Plaintiff asserts a cause of action associated with a contract that Mr.

Bulgarelli signed for salvage services provided by plaintiff to Mr. Bulgarelli in

August of 2012. Mr. Bulgarelli defends that cause of action by, among other

things, claiming that he was the victim of fraudulent conduct on the part of

Captain Leslie in that Captain Leslie stated that the cost of the services provided

would not exceed $1,200.00 and subsequently submitted a bill for $9,000.00 to

him and his insurance company.

Admiralty courts possess the authority to set aside a salvage contract that

was procured through the salvor's misrepresentation. *Black Gold Marine, Inc. v.

Jackson Marine Company, Inc.*, 759 F.2d 466, 469-70 (5th Cir. 1985). "To prevail

on a claim that a contract was fraudulently procured, the party that was deceived

must show that (1) the deceiving party made a material misrepresentation or

nondisclosure, (2) the representation was false or the nondisclosure implied that

18

the facts were different from what the deceived party understood them to be, (3)

the deceiving party knew that the representation was false or that the

nondisclosure implied the existence of false facts, (4) the deceiving party intended

the deceived party to rely on the misrepresentation or nondisclosure, and (5) the

deceived party detrimentally relied upon the misrepresentation or nondisclosure."

*Id*.

As noted above, the court credits the testimony of Mr. Bulgarelli,

corroborated by the testimony of Ms. Jones, that Captain Leslie stated the cost of

the salvage work would not exceed $1,200.00 and that Mr. Bulgarelli relied on

that when he signed the contract and authorized Captain Leslie to free his boat

from the grounding.  The cost of the salvage is clearly a material factor.  The court

also credits the testimony of Mr. Bulgarelli that he was never told the cost of the

salvage would be $250.00 per foot, that the handwritten notation "$250.00 FT"

was not on the contract when he signed it and was added after the signing.  When

Captain Leslie told Mr. Bulgarelli that the cost of the salvage would not exceed

$1,200.00 he knew that the statement was false and Captain Leslie intended that

Mr. Bulgarelli would rely on that estimate and authorize the work to be done.  It is

reasonable to infer that Captain Leslie intended to submit the $9,000.00 bill to the

insurance company in the hopes that the insurance company would pay all or most

of the bill without additional obligation to Mr. Bulgarelli.  Mr. Bulgarelli relied on

19

the statement of Captain Leslie when he decided to proceed with the salvage of his boat and such reliance was to his detriment given the dramatically increased cost of the work.  Based on the above, the Court finds that the contract on which plaintiff's claim is based was procured by fraud and is, therefore, void.

Plaintiff also seeks damages based on a quantum meruit theory.  Having determined that the actions of Captain Leslie were fraudulent in nature, the Court believes it is appropriate to deny plaintiff any recovery in this case.  "Because of the heightened vulnerability of a distressed ship ... to exploitation by salvors, '[t]he law cannot ... tolerate salvors [sic] dishonesty, corruption, fraud, falsehood, either in rendering the service, or in their proceedings to recover the salvage.'" *Jackson Marine Corporation v. Blue Fox*, 845 F.2d 1307, 1309 (5th Cir. 1988), quoting *Church v. Seventeen Hundred and Twelve Dollars*, 5 F.Cas. 669 (S.D. Fla. 1853).  The fraudulent conduct of Captain Leslie is imputed to the corporate plaintiff in light of the fact that the conduct of Captain Leslie was undertaken within the scope of his employment with the corporate plaintiff.  *Id*. at 1310.[4]

Plaintiff's claim for a lien on the defendant vessel is denied in light of the above ruling denying plaintiff any damages for the salvage of the defendant

---

[4] Defendants' attorney seemed to concede during the trial that plaintiff was entitled to payment for the reasonable value of the services provided which counsel estimated to be approximately $1,000.00.  Defendants can pay plaintiff for what he believes to be a reasonable amount if he chooses to do so but is not obligated to.

vessel.

Defendants' counterclaim for fraud is addressed above and relief is granted in the form of the ruling voiding the contract claim of plaintiff as well as the quantum meruit claim.  Defendants sought no other relief on that claim.

The counterclaims for innocent misrepresentation and reformation are denied.  These claims are made under state law and not all state claims are appropriate in admiralty cases as they might be in diversity cases.  In admiralty cases "our touchstone is a concern for the uniform meaning of maritime contracts ...  We have explained that Article III's grant of admiralty jurisdiction 'must have referred to a system of law coextensive with, and operating uniformity in, the whole country.  It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.'" *Norfolk Southern Railway Co., v. Kirby*, 543 U.S. 14, 28 (2004).  Where matters relating to a maritime contract are "inherently local," state law might be applied as long as the state law can be "accommodated without defeating a federal interest."  *Id*. at 27.  In the present case, there is no compelling "local" interest that would require the application of state law to these circumstances rather than federal law.  The events relevant to

this case took place in or near an international shipping channel on a body of water that separates two sovereign countries.  Applying a "local" rule of law to these circumstances would contravene the federal goal of promoting uniform decision making in admiralty cases.

Even though uniformity and consistency are cornerstones of admiralty law, existing maritime law may not cover every situation and where that is the case, "judges in admiralty cases frequently adopt state law rules through a process of 'borrowing,' thereby incorporating them into the general maritime law.  This 'borrowing' process is frequently accomplished; for example, much of general maritime tort law is borrowed state law. ... In this borrowing process the federal courts prefer to borrow the general common law rather than the law of any particular state because this promotes uniformity in the general maritime law." *1 Admiralty & Mar. Law* § 4-2, The Application of State Law in Admiralty (5th ed.), Thomas J. Schoenbaum (footnotes omitted).

With respect to the source of the "general common law" that would apply to these circumstances, courts have looked to the Restatement of Laws.  *Jackson Marine*, 845 F.2d at 1310; *see also*, *Conticarriers & Terminals, Inc. v. Delta Bulk Terminal*, 807 F.Supp. 1252, 1255 (M.D. La. 1992).  Defendant's claim regarding innocent misrepresentation does not appear in that form in the *Restatement (Second) of Contracts*, § 164 (1981) but a similar claim - non-fraudulent

misrepresentation - is identified.  Under the *Restatement*, a non-fraudulent
misrepresentation may void a contract if the misrepresentation was material, if the
recipient of the misrepresentation was induced to make the contract based on the
misrepresentation, and if the recipient was justified in relying on the
misrepresentation.  *Id*.  Had the facts in this case demonstrated that Captain Leslie
made a non-fraudulent misrepresentation regarding the fees for his salvage efforts,
this would have been a viable claim for defendant.  Mr. Bulgarelli relied on the
misrepresentation as to the salvage fees and his reliance on the misrepresentation
was justified.  However, as determined above, Captain Leslie's misrepresentation
was fraudulent and, therefore, the facts of this case do not fit the defendant's claim
in this regard.

As to defendant's claim for reformation, there is a question whether an
admiralty court has jurisdiction over a reformation claim.  "[R]eformation [of a
contract] is outside of the maritime jurisdiction of [an admiralty court based] on
the longstanding principle that, although admiralty courts determine cases upon
equitable principles, they do not grant equitable relief."  *Paul Marsh*, *Inc. v.
Edward A. Goodman Co.*, *Inc.*, 612 F.Supp. 635, 638 n. 6 (S.D.N.Y. 1985).
However, in *ATS International Services*, *Inc. v. Kousa International, LLC,* 2014
WL 1407290 *5-6 (D. Md. 2014), the court applied Maryland state law in ruling
on a reformation claim regarding a maritime contract.

23

For reformation to apply, assuming this Court has jurisdiction over a reformation claim in an admiralty action, the *Restatement* requires that it be premised on "a mistake of both parties as to the contents or effect of the writing." *Restatement (Second) of Contracts* § 155 (1981).  In this case, the facts do not demonstrate a mutual mistake as to the terms of the salvage agreement and therefore defendant's claim for reformation is not appropriate.

## VII.  CONCLUSION

Accordingly, **IT IS ORDERED** that judgment will be entered in favor of defendants and against plaintiff on all of plaintiff's claims and in favor of plaintiff and against defendants on all of defendants' counter-claims, except for defendants' counter-claim of fraud.  As to defendants' counter-claim for fraud, judgment will be entered in favor of defendants.

**IT IS SO ORDERED**.

Date: August 4, 2014                    s/Michael Hluchaniuk
                                        Michael Hluchaniuk
                                        United States Magistrate Judge

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on August 4, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Brandon John Wilson, Dennis M. Rauss</u>.

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov
